SHELL OIL COMPANY, a corporation, Appellant,

v.

Norman J. KELINSON and Middle Road Shopping Center, Inc., a corporation, Appellees.

No. 52898.

Supreme Court of Iowa.

May 7, 1968.

Doerr, Dower & Rehling, Davenport, for appellant.

Betty, Neuman, McMahon, Hellstrom & Bittner, Davenport, for appellees.

MOORE, Justice.

This is an equity action brought by plaintiff, Shell Oil Company, hereinafter designated Shell, against defendant, Middle Road Shopping Center, Inc., hereinafter designated Shopping Center, for specific performance of a written option agreement whereby Shell was offered the opportunity to purchase real estate within a specified period for $65,000. The trial court found Shell failed to establish an absolute acceptance of the option and that their conditional acceptance was not binding on the parties. The court also found the parties mutually waived any rights under the option by their respective acts and conduct and hence denied recovery. Plaintiff has appealed. We reverse and remand.

The subject matter of the option agreement is an irregular tract of land 180 feet x 120 feet x 80 feet x 150 feet fronting on a service road and lying a few feet south of Middle Road, a thoroughfare in Betten-

dorf. Shell proposes to construct a service station on this parcel of land. At trial time Middle Road was two lane accommodating traffic from both east and west. The Iowa State Highway Commission, however, had acquired land in the vicinity and was planning construction of a divided four lane thoroughfare over Middle Road with the eastbound traffic utilizing the two lanes adjacent to Shell's tract. Naturally Shell was concerned about access to and from this parcel from the proposed road and expressed a desire to be provided both easterly and westerly approaches. On November 25, 1964 an option agreement drafted by Shell was presented by its representative, Richard W. Parlier, to Norman J. Kelinson, president of Shopping Center. Kelinson signed this on January 8, 1965 in his official capacity as president.

The agreement is set out verbatim in the record and to here include it would unduly lengthen this opinion. We now set out portions thereof we deem of primary importance and will refer infra to other portions.

"This is an agreement, dated November 25, 1964, between Middle Road Shopping Center, Inc., an Iowa Corporation with offices at 1228 Coffelt Avenue in Bettendorf, Iowa * * * and Shell Oil Company, a Delaware Corporation with offices at 212 South Central, Clayton, Missouri, * * *.

"1. Option. In consideration of ten and no/100 Dollars ($10.00) received by Seller, Seller hereby grants to Shell the option to purchase the following described land located on Middle Road in Bettendorf * * *.

"2. Price. The purchase price shall be Sixty Five Thousand and 00/100 Dollars ($65,000.00).

"3. Period. Shell may exercise this Option by giving Seller notice at any time during the primary period from the date hereof through March 1, 1965 * * *."

The instrument also contained a description of the land and provided for such contingencies as the construction of a service road, grading, sewer and water facilities, design of the service station, allocation of various expenses to the parties, and the manner in which required notice would be given. Also included was a twenty year restriction precluding Shopping Center from selling adjacent property which it owned to a third party for use as a service station.

Shell on March 1, 1965 sent this registered letter to Shopping Center: "Middle Road Shopping Center, Inc. 1228 Coffelt Avenue, Bettendorf, Iowa — Gentlemen: Reference is made to the Option Agreement dated November 25, 1964, covering the premises at Middle Road and Duck Creek Plaza, Bettendorf, Iowa.

"This is to notify you that Shell Oil Company hereby exercises its option to purchase this property. In accordance with Article 4 of the Option Agreement, please submit evidence of ownership at your earliest convenience. Yours very truly, Shell Oil Company /s/ M.B.H. M. B. Holdgraf, Division Manager."

Shopping Center's pleadings admit execution of the option agreement and receipt of this letter but deny it amounted to a binding exercise of the option.

Over timely objection by plaintiff's counsel another letter dated March 1, 1965 was introduced into evidence. It was a Shell inter-office communication from the regional real estate manager to Mr. Holdgraf. The final paragraph thereof read: "Therefore, our approval is actually subject to a satisfactory arrangement and agreement with the Shopping Center developers from whom we are purchasing the property as to the maintenance of the service road after it is originally installed. Also as to the final, permanent location of the entrances to the Shopping Center as indicated on your plat." The option agreement contained no provision pertaining to future maintenance of the service road. On March 1, 1965 there was uncertainty con-

cerning the placement of the eastern access to Middle Road.

About 8:30 a. m., March 9, 1965 a meeting was held at the Blackhawk Hotel Coffee Shop in Bettendorf. In attendance were Mr. Parlier, Mr. Kelinson, Mr. Sam Comess, a business partner of Kelinson in the transaction, and Mr. Dean Fry, a general contractor who sometime in the summer or fall of 1965 entered into a profit sharing arrangement with Shopping Center on some property he owned on Middle Road. Mr. Fry testified he left the meeting after only a few minutes.

The details discussed pertained to grading the site and surfacing the service road. Also touched upon was which party was responsible for future maintenance of the service road as the option agreement did not cover this specifically. The parties were unable to agree on this point. The discussion then turned to the problem of access to Middle Road. Kelinson stated he would have no problem procuring the one to the west but as to the eastern access he was presently unable to do so. This result obtained because when the option was entered into in November 1964 Kelinson then had the land over which the eastern access was to pass under a three year option from the owner, Mr. VenHorst. Subsequently his option expired and allegedly VenHorst would not renew it as of March 9, 1965. However, Kelinson assured Parlier he could again obtain the option from VenHorst and would do so.

Upon learning Shopping Center might not be able to acquire the desired eastern access, Parlier expressed doubt as to whether Shell would close on the agreement. At this point he produced the inter-office communication addressed to Mr. Holdgraf and showed it to Kelinson and Comess. Kelinson testified Parlier then said "that if we couldn't deliver what was in the option that we didn't have a deal, and also that Shell couldn't make all the deals. Something to that effect. He lost some before." Comess testified Parlier said, "that this is

not the first time that Shell has lost a deal or words to that effect."

Both Kelinson and Comess testified that immediately after this meeting adjourned they discussed the desirability of locating other purchasers since they doubted Shell was going to fulfill the contractual obligations. They in fact contacted four other major oil companies, two motel chains and a supermarket.

Regardless of this alleged doubtful state of mind the record is undisputed that certain tasks were undertaken pursuant to fulfilling the contractual obligations arising under the option. The afternoon of March 9 Comess hired a registered surveyor to complete a boundary survey of the tract which was being sold to Shell. Kelinson and Comess were continually assuring Parlier they would be able to obtain the land necessary for the eastern access to Middle Road. Kelinson requested Parlier to advance him funds on the contract in order to start grading the site in conformance with the agreement. On May 23 or 24, 1965 Kelinson sent Parlier to his attorney's office to obtain the abstract of title. Delivery was not actually made.

On May 23 or 24, 1965 Parlier learned Mobile Socony Oil Company was seeking to purchase the land to the east over which Shell's proposed eastern access was to pass. On June 7, 1965, Parlier received a letter from Shopping Center's attorney stating they did not intend to proceed with completion of the purchase option. In December 1965 Mobile Socony obtained title to a tract of land to the east over which Shell's access was to have gone. The tract was sold to Mobile Socony by Dean Fry who had himself succeeded in purchasing it from VenHorst. The irregular tract of land which is the subject of this litigation has not been sold and is owned by Shopping Center.

I. Shopping Center contends Shell's letter of March 1, 1965 was a mere conditional acceptance and not a binding acceptance of the option. The trial court's

ruling was partially premised on this contention.

■ The rule is well settled that in a contract by offer and acceptance, the acceptance must conform strictly to the offer in all its conditions, without any deviation or condition whatever. If there is any qualification attached which calls for further understanding or correspondence in order to determine the final meeting of the minds of the parties, the acceptance falls short of closing the contract. O'Brien v. Fitzhugh, 204 Iowa 787, 790, 215 N.W. 944, 946; National Produce Co. v. Dye Yaus Co., 199 Iowa 286, 288, 201 N.W. 572, 574; Foshier v. Fetzer, 154 Iowa 147, 165, 134 N.W. 556, 564; 17 Am.Jur.2d, Contracts, section 62; 17 C.J.S. Contracts § 42; 1 Corbin on Contracts, section 82; Restatement, Contracts, sections 59, 60.

■ Shell clearly, unequivocally, and without any expressed reservations accepted Shopping Center's offer on March 1, 1965. More unequivocal terminology can hardly be imagined than that found in Shell's letter of March 1. Shopping Center seeks to circumvent its contractual obligations by asserting as a defense the Shell inter-office communication called to its attention more than a week subsequent to Shell's acceptance. We are not persuaded such a circumstance, even coupled with a manifestation of doubt expressed by the Shell employee, amounts to a conditional acceptance enabling Shopping Center to avoid its obligations under the option. The frailty of its defense is even more apparent if the converse of the present situation be imagined. That is, if Shopping Center were suing Shell for damages for breach of contract, could the existence of inter-office communication be successfully urged as a defense by Shell? We think not. Employing similar reasoning, we deem the same evidence incapable of supporting Shopping Center's defense of conditional acceptance.

II. Shopping Center next claims that if we find the letter of March 1 constituted a valid acceptance the contract was subsequently mutually rescinded by the oral statement of Parlier and by acts and conduct of the parties inconsistent with the terms of the written contract. Such an argument immediately raises the question of whether such evidence is admissible under Code section 622.32, known as the statute of frauds. Shell objected to the evidence on this ground.

Shopping Center argues that evidence of an oral rescission of a contract conveying an interest in real estate does not fall within the statute and therefore the trial court properly admitted evidence relative thereto. That we have in some cases permitted consideration of such evidence see Wilson v. Holub, 202 Iowa 549, 554, 210 N.W. 593, 595, 58 A.L.R. 646; Henderson v. Beatty, 124 Iowa 163, 169, 99 N.W. 716, 718. Assuming arguendo such evidence in this case is not barred by the statute, which we do not decide, we do not conclude its admission would entitle Shopping Center to prevail.

91 C.J.S. Vendor & Purchaser § 124b, page 1051, states: "Proof of the rescission by parol of a contract for the sale of land, should be clear and convincing, and should be sufficient to prove that a rescission was intended by the parties, mere preponderance of parol evidence being insufficient, and the person trying to establish a parol rescission has the burden of proving it."

In considering a contention of rescission by parol of a contract for the sale of real estate in McLain v. Smith, 201 Iowa 89, 98, 202 N.W. 239, 243, we say: "The burden of proof is on the plaintiff in this case on this question to show that there was an intention on the part of Smith to rescind said contract by what he did, and we feel that the plaintiff has not sustained this burden of proof, as the law requires that the proof of rescission of a written contract by parol testimony must be such as to be clear and convincing, and satisfy the mind that a rescission was the intent in the minds of the parties."

The record, which under rule 334, Rules of Civil Procedure, we review de novo, is notably lacking of clear and convincing evidence of an oral rescission. Kelinson and Comess testified that as a result of the March 9 meeting they thought "possibly" Shopping Center no longer had a deal with Shell. Parlier denied having stated anything at the meeting which would have conveyed such an impression. At trial time Parlier was no longer a Shell employee.

The conduct of the parties strongly supports Parlier's version of the conversation. If Shopping Center considered the agreement rescinded it is most difficult to understand why thereafter it proceeded with duties called for under the option such as ordering a boundary survey, requesting an advance on contract funds, continually assuring Shell it could procure the eastern access and as late as May 23 asking Parlier to pick up the abstract of title. We cannot agree the evidence is sufficiently clear and convincing to sustain a finding of an oral rescission of the contract, even assuming we allow such evidence under the statute of frauds.

III. As an alternative defense Shopping Center contends if there was a valid exercise of the option the rights of both parties were subsequently waived and terminated by their acts and conduct. We do not agree.

In Kilpatrick v. Smith, 236 Iowa 584, 595, 19 N.W.2d 699, 704, we quote this from Mortensen v. Frederickson Bros., 190 Iowa 832, 846–848, 180 N.W. 977, 982: "It is undoubtedly the law that the parties to a contract can mutually agree to a rescission of the same. This is the rule of our cases. * * * 'The rescission of a contract by mutual consent does not require a formal agreement or release, but may result from any act or course of conduct of the parties which clearly indicates their mutual understanding that the contract is abrogated or terminated, or from acquiescence of one party in its explicit repudiation by the other.' * * * There can be rescission by the acts and conduct of the parties without an express oral agreement to rescind."

As we have already pointed out the acts and conduct of the parties negate any rescission of the contract here. The record fails to reveal any acts and conduct clearly demonstrative of an intention to mutually rescind or acquiesce in such a rescission on the part of both parties.

IV. Shopping Center also pleads and asserts Shell is equitably estopped to claim specific performance of the option agreement. Promissory or equitable estoppel requires proof of at least three essential elements, (1) a clear and definite oral agreement, (2) that plaintiff (defendant here) acted to his detriment solely on said agreement and (3) that a weighing of all the equities entitles plaintiff (defendant here) to the equitable relief of estoppel. Miller v. Lawlor, 245 Iowa 1144, 1154, 66 N.W.2d 267, 273, 48 A.L.R.2d 1058.

The evidence falls considerably short of establishing a definite agreement to rescind. It is difficult, if not impossible, to conclude Shopping Center, Kelinson and Comess relied solely on the oral statements of Parlier at the March 9 meeting. Considering all the evidence we are not persuaded the equities so preponderate in Shopping Center's favor as to entitle it to relief under the theory of equitable estoppel.

V. Under the terms of the option agreement the obligations of both parties automatically terminated if Shell failed to meet certain conditions within 120 days after acceptance of the option. That period expired July 1, 1965. Shell concedes noncompliance with these conditions within the time period. Accordingly Shopping Center asserts the agreement was terminated by its own terms. We do not agree.

On May 23 or 24, 1965 Shell learned Mobile Socony was seeking to purchase land adjacent to their irregular tract. Subsequently Shopping Center refused Shell's

request for an abstract of title and on June 7 sent Shell a letter stating its refusal to go forward under the agreement. Shell filed this action on June 25, 1965. Shopping Center being in substantial default cannot now be allowed to escape its obligations under the agreement by claiming a rescission according to its terms. Maytag Co. v. Alward, 253 Iowa 455, 466, 112 N.W.2d 654, 660, 96 A.L.R.2d 162; Schmidt Bros. Const. Co. v. Raymond Y.M.C.A., 180 Iowa 1306, 1312, 163 N.W. 458, 460; 17A C.J.S. Contracts § 423; 17 Am.Jur.2d, Contracts, section 365.

■ VI. Pursuant to our conclusions reached on the issues presented we hold Shell entitled to specific performance in accordance with the terms of the option agreement. At trial time, however, Shopping Center was partially disabled as it did not own the property over which the eastern access was to be furnished. Notwithstanding this fact and also that Shopping Center was required to make certain improvements Shell elected to seek specific performance with abatement. It was entitled to make such an election and to have such relief.

In Urbain v. Speak, 258 Iowa 584, 589, 590, 139 N.W.2d 311, 314, we quote this from Anderson v. Weirsmith, 209 Iowa 714, 727, 229 N.W. 199, 205: "* * * [A]lthough the purchaser cannot have a partial interest forced upon him, yet if he entered into a contract in ignorance of the vendor's incapacity to give him the whole, he is generally entitled to have the contract specifically performed, as far as the vendor is able * * *. This is not making a new contract for the parties, since the vendor is not compelled to convey anything which he did not agree to convey. * * *"

■ Under such circumstances the vendee may compel the vendor to convey his defective title or deficient estate, and at the same time have a just abatement out of the purchase price for the deficiency of title, quantity or quality of the estate to compensate for the vendor's failure to perform

the contract in full. Anderson v. Weirsmith, supra; Ormsby v. Graham, 123 Iowa 202, 210, 98 N.W. 724, 727; Smith v. Hornkohl, 166 Neb. 702, 90 N.W.2d 347, 355, 356; 49 Am.Jur., Specific Performance, section 105; 81 C.J.S. Specific Performance § 162e.

Under the terms of the contract Shopping Center agreed to install a concrete or asphalt service road along Middle Road between two proposed approaches to Middle Road, to grade the premises to not more than one foot above the proposed grade of Middle Road, to extend water and sewer to the property, and to provide a perpetual nonexclusive easement for driveway to the Middle Road approaches. On trial Shell offered proof of the reasonable costs of these improvements as bearing on the amount to be abated. In its brief Shell points out the court could find that amount to be as high as $24,160 and as low as $14,390. Much of the uncertainty is created by the fact at trial time the highway commission had not definitely located the eastern point of access and thus the length of the service road could not be definitely determined.

Apparently location of the eastern access is now fixed. Shopping Center asserts in its brief if specific performance is decreed they are now able and desire to fully perform.

Because of the uncertainty of the record regarding amount of abatement and in exercise of general equitable powers this cause is remanded to the Scott District Court to decree specific performance and to give Shopping Center a reasonable time to do all things it has agreed to do and upon full performance to receive the $65,000 pursuant to the agreement. If Shopping Center is unable to fully perform, the district court should take further evidence on the question of the amount of abatement and enter judgment and decree accordingly.

Reversed and remanded.

All Justice concur except LeGRAND, J., takes no part.